[No. B239983. Second Dist., Div. Eight. Sept. 27, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL VALADEZ et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 1. and 3. through 8. of the Discussion.

## COUNSEL

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Valadez.

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant Frank Uribe.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell, Thomas C. Hsieh and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FLIER, J.**—Appellants Frank Uribe and Daniel Valadez challenge their convictions for conspiring to commit the crimes of shooting from a vehicle and assault with a semiautomatic firearm and for possession of a firearm by a felon, along with gang and other enhancements. They raise a host of alleged

errors, both together and individually.[1] In the published portion of this opinion, we reject their evidentiary and confrontation clause challenges to the prosecution's gang expert witness. In the unpublished portion, we find no prejudicial error on any other ground. We affirm. We modify the judgment to reflect additional presentence credits as provided herein.

## PROCEDURAL HISTORY

Appellants were charged with conspiracy to commit the crimes of shooting from a vehicle and assault with a semiautomatic firearm (Pen. Code, §§ 182, subd. (a)(1), 245, subd. (b), former § 12034, subd. (c) [repealed eff. Jan. 1, 2012, and reenacted as Pen. Code, § 26100, subd. (c) without substantive change]),[2] and being felons in possession of a firearm (former § 12021, subd. (a)(1) [repealed eff. Jan. 1, 2012, and reenacted as § 29800, subd. (a)(1) without substantive change]).[3] It was alleged that the acts were committed for the benefit of, at the direction of, and in association with, a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(B)). It was also alleged as part of count 1 that Valadez was armed with a firearm (§ 12022, subd. (a)(1)), and as part of counts 1 and 2 that he had incurred a prior serious or violent felony "strike" conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior serious felony conviction (§ 667, subd. (a)(1)).

Appellants stipulated to their prior felony convictions, and following trial a jury convicted appellants as charged and found the firearm and gang allegations true. Valadez was sentenced to a state prison term of 23 years on count 1 and his sentence on count 2 was stayed, and Uribe was sentenced to a state prison term of 14 years on count 1 and his sentence on count 3 was stayed. In addition to imposing various fines and fees, the court granted each appellant 852 days of presentence custody credit, which consisted of 742 actual days and 110 days of conduct credit. Both appellants timely appealed.

---

[1] They have also indicated they join each other's arguments.

[2] Undesignated statutory citations are to the Penal Code.

[3] In support of the conspiracy count, the following overt acts were alleged: "On or about March 6, 2010 at approximately 1:50 A.M., Frank Uribe, Daniel Valdez [sic], and/or one or more unidentified co-conspirators entered rival gang territory claimed by the Locke Street criminal street gang"; "At the time they entered Locke Street gang territory, Frank Uribe, Daniel Valdez [sic], and/or one or more unidentified co-conspirators were wearing bandanas covering the lower portion of their faces"; "On or about March 6, 2010 at approximately 1:50 A.M., Frank Uribe, Daniel Valdez [sic], and/or one or more unidentified co-conspirators was armed with a Glock semiautomatic firearm, serial # ATG469." A fourth overt act was stricken.

## STATEMENT OF FACTS

1. *Prosecution Evidence*

Around 1:50 a.m. on March 6, 2010, Los Angeles Police Department (LAPD) Officers Richard Wilson and Peter Bueno were heading east on Ithaca Avenue in El Sereno while on patrol. They each saw a white vehicle on Ithaca Avenue with its lights off, driving "extremely slow," about five miles per hour in their direction. There were no other people or traffic in sight. The officers each shined a spotlight on the car and saw Uribe in the driver's seat and Valadez in the front passenger seat wearing green bandanas covering the lower portion of their faces, which they pulled down as the officers drove by.

The car accelerated as it passed the officers and Wilson drove in reverse down Ithaca Avenue to follow it. It turned down Belleglade Avenue, and Wilson completed a three-point turn and pursued it. It came to a rolling stop at Alhambra and Belleglade Avenues, at which point the officers saw Valadez, the front passenger, throw a black or blue steel handgun out the passenger window. After that, the officers saw furtive movements in the car. The car turned onto Alhambra Avenue, where the officers conducted a traffic stop near Valley Boulevard and requested a backup unit.

After additional officers arrived and took appellants into custody, Officer Lowe[4] drove Officer Bueno back to Alhambra and Belleglade Avenues, where Officer Lowe recovered a black semiautomatic pistol from where Officer Bueno had seen the gun tossed from the car. It was fully loaded with 16 rounds; it was not registered to either appellant and no usable fingerprints were recovered from it. After a search, three bandanas were recovered from the car: a green bandana from under the driver's seat, and one green and one blue bandana from under the front passenger seat.

Officers ran the car's license plate and learned it had possibly been carjacked in West Covina, although Officer Wilson did not intend to arrest appellants only for carjacking. West Covina officers briefly took custody of appellants, but no carjacking or car theft charges were filed.

In the transcript of the radio transmission between Officer Bueno and dispatch, there was no mention at any time of a gun being tossed from appellants' car. Officer Bueno testified it would have been important information to broadcast when reasonable and safe to do so, but at the time he did not share that information because he wanted to keep eyes on appellants, who

---

[4] Apparently Officer Lowe's first name does not appear in the trial record.

were making furtive movements and possibly reaching for another weapon. The reports prepared by Officers Bueno and Wilson also did not state appellants were driving slowly with their headlights off. Neither officer recalled Officer Lowe being on the radio that night or calling him on his cell phone before he arrived on the scene.

The prosecution called Officer Allan Krish as a gang expert witness. He testified appellants were members of a gang called "Lowell Street," which split from a larger gang called "El Sereno" in the 1980's. Krish had been an officer for six and a half years and had been assigned to a gang enforcement division from March 2009 to January 2011. Part of that position was to keep up to date on gang activities in the Hollenbeck division by gathering intelligence on gangs in the area; identifying and photographing gang members; tracking gang members and their activities; working with parole and probation officers and gang detectives; conducting probation, parole, and compliance searches on gang members; and investigating gang-related crimes. Officer Krish had approximately 40 hours of training at the Los Angeles Police Academy on gang awareness, including gang terminology, culture, dress, and behavior. He also attended a four-day training held by the California Gang Investigators Association in late 2009. And he had contact with gang members on a daily basis, which could be "nothing more than [a] casual conversation," during which he would ask them if they would be willing to talk and if they agreed, he would speak with them. He explained the importance of these interactions: "As a gang officer, when you are assigned to monitor a specific gang or area, you get a lot of information by just talking to gang members if they're willing to talk to you and get to know who belongs in that area, who doesn't belong in their area, what's going on with the gang." He also spoke with gang members while on patrol and in arrestlike situations. He spoke with other officers, gang experts, and gang detectives, and read online articles.

Officer Krish explained several ways in which someone would enter a gang: by being "jumped in" or beaten; by being "courted in" or having a family member already part of the gang; or by completing a "mission," which could be anything from graffiti to murder. Once part of the gang, a member must still prove loyalty to the gang by "putting in work," or by doing things to benefit, promote, and earn respect for the gang and to establish fear in the community.

Officer Krish had testified numerous times as a gang expert witness on gangs in the Hollenbeck area, including El Sereno, Lowell Street, and Rose Hills gangs. With regard to El Sereno and Lowell Street, Officer Krish learned the history and inner workings of the gangs from gang experts and gang detectives, some with 30 years of experience on the job, by reading

"verbiage and literature" from department resources, and by talking with gang members to confirm the information he knew. He explained El Sereno was started in the 1960's, taking the name from the El Sereno community it claimed, and its purpose was to protect the area from outside gangs. At the time of trial, it had 360 to 400 predominantly Hispanic members. El Sereno also had "cliques" based on neighborhoods, including the Ithaca Avenue clique and the Guardia Street clique with territory in the area around Ithaca and Belleglade Avenues.

Lowell Street was started after an internal conflict within the El Sereno gang in the mid- to late-1980's over narcotics distribution and who would pay "taxes" for criminal activities. It took its name from the Lowell Avenue area it controlled, bordered by the City of South Pasadena to the north, Stillwell Avenue to the west, Huntington Drive to the south, and the City of Alhambra to the east. At the time of trial, Lowell Street had 34 documented members, a fact Officer Krish learned from department resources. Officer Krish initially testified he had personally met three or four of them and learned none still lived in the area from speaking to them, from speaking to El Sereno gang members, and from the fact that he also had not had contact with Lowell Street members in that area. On cross-examination after speaking with another officer, he testified he could not say for sure whether any members still lived there because they would not be visible in the area due to their "green light" status (discussed below).

When Lowell Street split from El Sereno, a "green light" on the Lowell Street members was established by the Mexican Mafia, a Hispanic prison gang, for the failure to pay taxes. The "green light" was an order giving permission to jump, assault, or kill any member of a gang without repercussions, a fact Officer Krish learned from tenured detectives, Internet research, and El Sereno and Lowell Street gang members. Also by speaking with tenured detectives, Officer Krish knew the Mexican Mafia prohibited driveby shootings, but that rule did not apply to green-lighted gang members. El Sereno, which was also known as Locke Street, was Lowell Street's main rival.

Officer Krish learned the primary activities of Lowell Street are assault with a deadly weapon; attempted murder; trafficking in methamphetamine, cocaine, and marijuana; weapons-related crimes; and robbery. He did not know the identity of the gang's leader or others in command. But he knew the Lowell Street gang has one hand signal (an "L" shape with the index finger and thumb), shows pride in the color green due to their green-light status, and often "tags" and tattoos the number 12 to signal "L" as the 12th letter of the alphabet. He also took a photograph in December 2009 of graffiti by the Guardia Street clique on a retaining wall within 200 yards of Lowell

Street territory that had been crossed out in orange paint and the letters "LSL" written over it, which stood for Lowell Street Locos. He believed it signaled Lowell Street was active in the area because he patrolled the area all the time, and the graffiti had not been there previously. Lowell Street members would also frequently come back to the area to hang out.

Although Officer Krish had not personally investigated any crimes associated with Lowell Street and did not have personal contact with either appellant, he opined appellants were members of the Lowell Street gang based upon field interview cards, the facts of the incidents at issue, conversations with other officers, and numerous tattoos displayed on appellants' bodies related to the Lowell Street gang. Given a hypothetical set of facts based on the circumstances of this case, Officer Krish opined individuals under these circumstances would have been riding in the car with the gun "for the benefit of, at the direction of, or in association with a criminal street gang": they acted in association with a gang because they were two gang members acting together; and they acted for the benefit of the gang because their actions instilled fear in the community and prevented individuals from calling the police. He opined these facts demonstrated "these two gang members" had committed or were about to commit a violent criminal act.

He testified gang members would know gang territories based on conversations with other gang members and from graffiti, and a Lowell Street gang member would know he was in rival territory on Ithaca Avenue where the incident occurred. He stated this activity would enhance the reputation of the Lowell Street gang if there were a general opinion on the street that Lowell Street did not exist anymore, showing Lowell Street was "strong and willing to roll into rival territory." That was true even if no pedestrians or vehicle traffic were present at the time because gang members will still talk about it; a Lowell Street gang member "[w]ill not drive through that area knowing it's not theirs, with bandanas on their face and a loaded gun in the car at five miles an hour and hope that nobody ever finds out. They're there for, like I said, one reason. And they bank on the fact that the community is going to be in fear and rival gang members are going to know that Lowell Street is alive and well." In response to another hypothetical, he stated a person in a gang would still be a gang member, even if he or she moved away from the area, got a bachelor's degree, went to law school and became a lawyer, and returned to the neighborhood to play basketball and drink beers with other gang members.

Officer Krish also testified an individual named Michael Adame, whom he believed to be a Lowell Street gang member, had been convicted of narcotics trafficking in 2009. Although there was no gang allegation in the case and nothing in the police reports indicating Adame was a gang member, Officer

Krish based his opinion on field interview cards, speaking with other gang members and gang officers, and a "Lowell" tattoo on Adame's back. He also discussed a specific past incident between the Lowell Street and El Sereno gangs in Alhambra in April 2010 during which three Lowell Street gang members stabbed an El Sereno gang member 12 times. One of the Lowell Street gang members stated during an interview that, "two or three years prior, this individual was involved in a drive-by shooting on Lowell Street and this was their payback."

Parole agent Daniel Lopez testified he supervised Valadez from November 2009 until he was arrested. He explained that, typically, parolees are assigned to their last legal residence or area where they committed their last crime, and were usually paroled to immediate family members. But Valadez's case was transferred from Los Angeles County to San Bernardino County because of special circumstances regarding potential threats to appellant's life and well-being. Valadez had mentioned to Lopez that "some people" were visiting his father and he felt it was a threatening environment. Lopez told him it was not wise for Valadez to be in that environment and that was why San Bernardino County accepted his transfer. At that time, Lopez discussed Valadez's green-light status with him and informed him as a condition of parole he was not to associate with fellow gang members. Lopez also told him he could not travel outside San Bernardino County without permission. On one occasion, Lopez gave him permission to attend a birthday celebration for a family member, and Valadez took the trip without issue. Lopez had not given him permission to leave the county on March 6, 2010, the day of the incident.

Over objection, the trial court admitted the first two pages of a "general chrono," which was a document in Valadez's Department of Corrections and Rehabilitation file. It showed Valadez's "residence plan" for parole as first for "Luis Valadez" in Los Angeles, and second for "Virginia Marquez" in Upland, in San Bernardino County. It also contained a statement from parole officer J. Ward reciting a statement from Valadez: "On November 18, 2009, inmate Valadez was interviewed due to his safety concern. He stated it would not be safety—well, safety [sic]—for him to parole to his father's address due to the Mexican Mafia having a green light on him. They have been asking his father about when he would be getting out of prison. Because of his gang status regarding the Lowell Street gang, he feels that a change in his parole address to Upland would keep his family as well as himself safe from harm."

2. *Uribe's Defense Evidence*

Uribe did not testify. Paul Kim, a retired LAPD commander, testified on behalf of Uribe that a police report is an important document and should be

as accurate as possible. If, for example, officers pulled a car over for driving at night without headlights, that should be noted in the police report or provided in a supplemental report. He reviewed the police frequency transmissions in this case and did not find any transmission to or from Officer Lowe's unit, and it would have been out of police policy not to call in when providing backup. Likewise, no officers broadcast that a gun was thrown out of appellants' car, and if an officer had seen that, the proper procedure would have been to broadcast that fact so responding units can go to that location. He could not think of a legitimate reason not to broadcast that information when two officers are in the unit, other than an officer is injured and unable to call it in.

Uribe also called former gang member, and current California attorney, Humberto Guizar as a gang expert. He testified he was not sure the Lowell Street gang still existed and although former members might come back to the area to visit, they were not engaged in gang activity. The last time he spoke with an active Lowell Street gang member was when Guizar himself was still a gang member 30 years ago. He testified Uribe was not a gang member because he was in his 30's, he had six children, and there was no evidence Uribe had done any gang graffiti or gang signs. He also did not believe Uribe was committing a gang crime when he was arrested because he had never heard of a gang member committing a "hit" while wearing a bandana over his face. He had also never heard Lowell Street had been given a green light. Regarding gang tattoos, he testified current tattoos do not necessarily signal active gang membership and there was a year-and-a-half waiting list for one tattoo removal program and other removal methods could be expensive.

Saul Romero, a "close personal friend" of Uribe, testified that he and Uribe's brother Tony picked up appellant Valadez around 11:00 a.m. the day before his arrest[5] and went to a beauty salon and then Yard House restaurant, where they stayed until around 9:30 or 10:00 p.m. After that, they went to Clancy's in Covina; on the way they called Uribe to ask if he wanted to have drinks for Valadez's birthday, and he eventually met them there. Around 2:00 a.m., Romero and Tony left together, and Uribe said he was going to give Valadez a ride home to his father's house.

LAPD Detective Hector Salas testified he took custody of Uribe after the West Covina Police Department cleared appellants of charges, at which point the LAPD "re-arrested" them on March 8, 2010.

---

[5] Although Romero testified he picked up Valadez on March 6, appellants were arrested on Saturday, March 6, 2010, at 1:30 a.m. We think in context Romero meant Friday, March 5, 2010.

### 3. *Valadez's Defense Evidence*

Valadez did not testify. He called Daniel Laughlin, a gang expert with 17 years' experience, who testified the Lowell Street gang was small, with 25 to 30 members, and it had been inactive for the last nine or 10 years. He also testified most inactive gang members did not remove their gang tattoos and free tattoo removal programs had long waiting lists. He testified Lowell Street was part of El Sereno but it refused to pay taxes in the 1980's, which was related to their "green light" status. He knew a Lowell Street gang member had been shot and killed three years before trial, but he did not know who had shot him. He testified former gang members are not still gang "banging" in their 30's.

Reuben Lara testified he had lived on Ithaca Avenue in El Sereno for 20 years and had seen some graffiti, had occasionally heard gunshots, including a shooting in December 2009 or January 2010, and had seen some "cholos" in the neighborhood, but he had never heard of Lowell Street as a gang. He had never seen either appellant.

Denise Valadez, Valadez's wife whom he had known for five years and married on July 2, 2010, when he was in custody, testified she and Valadez would visit Valadez's father, Luis Valadez, in El Sereno about every other week, and she would never travel on Ithaca Avenue to get there. Valadez did not work the day before his arrest[6] and his friends picked him up to go to his father's house to help him clean the yard. His birthday had been March 1, and he was going to celebrate with his friends afterward.

Valadez's father, Luis, testified he spoke with Valadez a few days prior to his arrest, and expected Valadez to come to his house that night to help clean. He had lived in El Sereno for 44 years and did not see any gang activity on his block. He testified no one had ever come to his house looking for Valadez and he did not know Valadez was a member of the Lowell Street gang, but said Valadez was associated with the gang when he was a teenager. He never saw appellant engage in gang activity and never talked to Valadez about gangs.

### 4. *Rebuttal Evidence*

The prosecution recalled Detective Salas, who testified booking approval documents reflected appellants were booked for conspiracy to commit assault with a firearm. The prosecution also called LAPD dispatcher and records

---

[6] Like Romero, Denise Valadez testified Valadez had March 6, 2010, the day of his arrest, off from work. Again, we think in context she meant March 5.

custodian Jed Fernandez, who generally testified as to incident recall print-outs for the night of the incident.

## DISCUSSION

1.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 2. *Gang Expert Testimony*

Appellants argue Officer Krish's testimony on the background and history of the El Sereno and Lowell Street gangs should have been excluded because it was based upon hearsay and violated their confrontation clause rights. We disagree.

### A. *Background*

Prior to trial, Uribe's counsel filed a brief arguing a gang expert cannot offer "nonspecific" hearsay statements regarding an incident unless the expert has personal knowledge of the incident and can specify "who, when, where and under what circumstances the alleged crimes were committed." The trial court did not immediately rule on the hearsay issue, but when Officer Krish began to testify about the history of the El Sereno gang, appellants' counsel objected for lack of foundation and competency. At sidebar, Valadez's counsel argued Officer Krish's testimony appeared to be "assumptions" predating his experience between 2009 and 2011, so it lacked foundation and rendered his testimony incompetent. Uribe's counsel also argued lack of foundation, and if his testimony was based on hearsay, he wanted to argue his hearsay brief. The court overruled the objections provided the prosecutor laid "a little more foundation," such as "if he's talked to other officers, more experienced officers, more senior officers, regarding the formation of El Sereno as well as has he ever talked to the gang[] members about it?" The court rejected the hearsay contention because "he's allowed to rely on hearsay in giving expert opinions" regarding "the background for Lowell Street and El Sereno and the conflict between them," and the court did not "see any reason to exclude that if [the prosecutor] establishes the source of this information and it's adequate."

Uribe's counsel understood "the expert can rely on hearsay in coming to his conclusions about opinions that he has in the case," but "[h]e cannot rely on hearsay to give direct testimony as to I know that El Sereno was started on

---

*See footnote, *ante*, page 16.

so and so by so and so because that's not—that's not why he's being called, and that's not part of the expertise for why the People are calling him." He argued Officer Krish was being called "just to set the stage, I guess, about what the gangs are and what their rivalries are." He recognized Officer Krish "can rely on hearsay in coming to an opinion on whether or not [appellants were] gang members" and whether "what the officers observed when they arrested him were [*sic*] consistent with what a gang member would do." But, according to Uribe's counsel, he could not rely on hearsay to testify to how El Sereno was started. The court inquired further, asking if counsel would object if the prosecutor asked Officer Krish about the Lowell Street split from El Sereno, their rivalry, and the green light, to which counsel responded Officer Krish could testify if he had personal knowledge of those subjects. The court wondered how Officer Krish would have personal knowledge other than the information provided by gang members and other officers. Uribe's counsel responded, "That's not my problem," and noted if Officer Krish had been out in the field doing consensual stops and gathering information, then he could testify to it. Valadez's counsel added Officer Krish could testify to "hearsay facts," but could not testify to what officers and other gang members told him. The court overruled the objections, subject to proper foundation.

Officer Krish then testified he became familiar with the history of El Sereno through "verbiage and literature that you read from department resources about the gang. [¶] I've talked to gang officers. I've talked to gang detectives with 30 years on the job. I talked to gang members themselves in the street during consensual encounters, talk to them about what I read, what I heard, what I learned, what I believe I know. And run it by them and confirm the information that I know." He testified he relied on similar sources to learn about Lowell Street. He testified on cross-examination that officers he spoke with got their information from the same sources, including speaking with gang members, and that it is possible gang members might lie, although he could not remember an instance of a Lowell Street gang member lying.

When he was recalled, Officer Krish testified appellants were gang members "[b]ased on self admissions, based on field interview cards that I reviewed, based on the facts of this incident, based on my conversations with the other officers, the tattoos that the two defendants display." At sidebar, Valadez's counsel objected on confrontation clause, due process, and other grounds, and Uribe's counsel renewed his hearsay objection, all of which were overruled.

B. *California Law*

Under Evidence Code section 801, subdivision (b), an expert witness may base an opinion on "matter (including his special knowledge, skill,

experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." ■ California law permits gang experts to rely on reliable hearsay evidence to form an opinion, even if the evidence would otherwise be inadmissible. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944–946 [44 Cal.Rptr.3d 237, 135 P.3d 649] (*Gonzalez*); *People v. Gardeley* (1996) 14 Cal.4th 605, 617–618 [59 Cal.Rptr.2d 356, 927 P.2d 713] (*Gardeley*).) Sources can include written material and conversations with gang members and other officers. (*Gonzalez, supra*, at p. 949; *People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 [109 Cal.Rptr.2d 851, 27 P.3d 739]; *Gardeley, supra*, at p. 620; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1122–1126 [120 Cal.Rptr.3d 251] (*Hill*); *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209–1210 [30 Cal.Rptr.3d 582] (*Thomas*); *People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9 [19 Cal.Rptr.3d 402].) We review the trial court's admission of expert testimony for abuse of discretion. (*Hill, supra*, at p. 1122.)

The trial court did not abuse its discretion in admitting Officer Krish's opinions on the general history of the El Sereno and Lowell Street gangs. Officer Krish had been an officer for six and a half years, and spent almost two years in a gang enforcement division. He kept up to date on gang activities in the Hollenbeck division by gathering intelligence on gangs in the area, identifying and tracking gang members and their activities, working with other officers and gang detectives, conducting searches on gang members, and investigating gang-related crimes. He had training on gang awareness, and he had contact with gang members on a daily basis. He relied on the same types of sources other courts have found appropriate for gang expert testimony, that is, conversations with gang members and officers, as well as written materials. And while individual sources such as gang members might be reasonably questioned, he did not rely on these sources alone or simply recite statements by others; he fit the information into all the other sources and his own experience to render his opinion. (*Hill, supra*, 191 Cal.App.4th at pp. 1124–1125.) Even Valadez's gang expert Laughlin testified about Lowell Street's failure to pay taxes and the split from El Sereno, corroborating Officer Krish's testimony. The trial court therefore properly admitted Officer Krish's expert testimony under California law.

## C. *Confrontation Clause*

 Officer Krish's testimony also did not violate appellants' confrontation clause rights.[11] As discussed above, California law permits gang experts to rely on otherwise inadmissible hearsay in forming opinions. In *Gardeley*, which did not involve the confrontation clause, the court suggested such "basis" evidence is not offered for its truth, but only to reveal the basis for the expert opinions. (*Gardeley, supra*, 14 Cal.4th at p. 619 [noting trial courts have discretion to limit expert questioning "because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact"].) Eight years after *Gardeley*, the United States Supreme Court decided *Crawford v. Washington* (2004) 541 U.S. 36, 59 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), holding the admission of testimonial out-of-court statements violates a defendant's confrontation rights unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*People v. Lopez* (2012) 55 Cal.4th 569, 576 [147 Cal.Rptr.3d 559, 286 P.3d 469] (*Lopez*).) *Crawford* makes clear, however, the confrontation clause does not apply to out-of-court statements not offered for their truth. (*Crawford, supra*, at p. 59, fn. 9; *Thomas, supra*, 130 Cal.App.4th at p. 1210.)

Courts since *Crawford* have interpreted *Gardeley*'s suggestion that gang expert basis evidence is not offered for the truth to defeat confrontation clause challenges under *Crawford*. (*Hill, supra*, 191 Cal.App.4th at pp. 1127–1128; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153–154 [94 Cal.Rptr.3d 98]; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426–1427 [64 Cal.Rptr.3d 96]; *Thomas, supra*, 130 Cal.App.4th at p. 1210.) In *Thomas*, for example, the court cited *Gardeley* and rejected a confrontation clause challenge to a gang expert's reliance on conversations with gang members in forming opinions because "experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Thomas, supra*, at p. 1210.) In *Hill*, the defendant argued several out-of-court statements supporting a gang expert's opinions were admitted for their truth and subject to the confrontation clause. (*Hill, supra*, at p. 1127.) Relying on *Thomas*, the trial court admitted the statements because they were not introduced for their truth, but only to assist the jury in evaluating the expert's opinion. (*Ibid.*) Though the Court of Appeal "disagree[d] with *Thomas*'s analysis of this important issue, *Thomas* appropriately relies on relevant Supreme Court

---

[11] We requested and received supplemental briefing on this issue from the parties.

precedent, principally *Gardeley* . . . , that we are required to follow," so the court felt compelled to reject the defendant's challenge. (*Ibid.*)

In a lengthy discussion, however, the court in *Hill* disagreed with the idea that expert basis evidence is not offered for its truth for confrontation clause purposes. (*Hill, supra*, 191 Cal.App.4th at pp. 1127–1128.) In its view, "[c]entral to the reasoning in *Gardeley* and *Thomas* is the implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements. Otherwise, the conclusion that the statements should remain free of *Crawford* review because they are not admitted for their truth is nonsensical. But this assumption appears to be incorrect." (*Id.* at pp. 1129–1130.) Relying on a New York case, the court suggested when basis evidence consists of out-of-court statements "the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Id.* at p. 1131.) As for the specific out-of-court statements at issue, the court suggested if the basis evidence was in fact offered for its truth and subject to the confrontation clause, most of the evidence on which the gang expert relied would not be "testimonial" because it consisted of consensual conversations with gang members and did not involve the investigation of any particular crimes. (191 Cal.App.4th at pp. 1135–1136.)

▇ Since *Hill*, a majority of justices on both the United States Supreme Court and our high court have indicated expert basis evidence is offered for its truth and subject to the confrontation clause. (*Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89, 132 S.Ct. 2221] (*Williams*); *People v. Dungo* (2012) 55 Cal.4th 608 [147 Cal.Rptr.3d 527, 286 P.3d 442] (*Dungo*).) In *Williams*, the defendant challenged a laboratory expert's testimony that a DNA report from a prior kidnapping, rape, and robbery—which was not introduced into evidence—matched a DNA sample taken from the defendant upon his arrest on unrelated charges. In a four-to-one-to-four decision, the court held there was no confrontation clause violation but a majority of justices could not agree on a rationale. Justice Alito, in a plurality opinion joined by the Chief Justice and two other justices,[12] reasoned the report was not offered for its truth, but for the limited purpose of explaining the basis for the assumptions underlying the expert's independent conclusion that the samples matched, and even if it was admitted into evidence for its truth, the report was not testimonial. (*Williams, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) The five other justices in two opinions (Justice Thomas, concurring in the judgment, and Justice Kagan, joined by three other justices, dissenting) all expressed the view the report was offered for its truth, although Justice Thomas found it was not testimonial, while the

---

[12] Justice Breyer wrote a concurring opinion while also joining Justice Alito's opinion "in full." (*Williams, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2252] (conc. opn. of Breyer, J.).)

dissenting justices found it was. (*Id.* at p. ___ [132 S.Ct. at p. 2257] (conc. opn. of Thomas, J.) ["[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose."]; *id.* at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.); *id.* at pp. ___, ___ [132 S.Ct. at pp. 2268, 2271] (dis. opn. of Kagan, J.) [the expert's description of the report "was offered for its truth because that is all such 'basis evidence' can be offered for"]; *id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.).)

In *Dungo*, a forensic pathologist testified the victim in the case had been strangled, basing his opinion on facts contained in an autopsy report by another pathologist, which was not introduced into evidence. (*Dungo, supra,* 55 Cal.4th at pp. 618–619.) The majority opinion, written by Justice Kennard and joined by the Chief Justice and three other justices, concluded the statements in the autopsy report were not testimonial, and therefore not subject to the confrontation clause. (55 Cal.4th at p. 621.) That opinion did not address the hearsay issue, although it noted the *Williams* plurality's nonhearsay rationale. (*Dungo,* at p. 618.) Justice Werdegar wrote a concurring opinion, however, which garnered majority support (joined by the Chief Justice and two other justices), explaining the statements in the report were offered for their truth, so they were subject to the confrontation clause. (55 Cal.4th at p. 627 (conc. opn. of Werdegar, J.).) In dissent, Justice Corrigan, joined by Justice Liu, noted, "When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that statement to the jury, a majority of the high court in *Williams* . . . rejects the premise that the out-of-court statement is not admitted for its truth." (*Id.* at p. 635, fn. 3 (dis. opn. of Corrigan, J.).)

If the currently constituted courts were called upon to resolve this issue, it seems likely the holdings in *Thomas, Hill,* and other cases extending *Gardeley* to find out-of-court statements offered as expert basis evidence are not offered for their truth for confrontation purposes will be significantly undermined.[13] But we need not decide the issue. Assuming the general out-of-court statements on which Officer Krish relied in testifying to the background of the El Sereno and Lowell Street gangs[14] were offered for their truth as appellants contend, they were not testimonial under the confrontation clause.

■ To be subject to the confrontation clause, out-of-court statements must be "testimonial." (*Crawford, supra,* 541 U.S. at p. 59.) In *Crawford,* the

---

[13] This does not mean *Gardeley*'s holding that an expert may rely on inadmissible hearsay as a matter of state evidentiary law is no longer a viable rule. Our discussion here is limited to the implications of expert testimony under the confrontation clause.

[14] Officer Krish did not testify to specific out-of-court statements, but we agree with appellants that those statements were implicit in his testimony.

court declined to give a comprehensive definition of testimonial statements, although it stated at a minimum the confrontation clause applies to " 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations,' " which, under the facts of the case, included recorded statements by a witness in response to structured police questioning. (*People v. Cage* (2007) 40 Cal.4th 965, 978 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*) [explaining *Crawford*].) In *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*), the court reviewed confrontation clause challenges in two cases: one involved out-of-court statements by a domestic violence victim on a 911 call describing the attack as it occurred, which the court held were not testimonial; the other involved a victim's statements to officers in response to questions after a domestic violence incident had ended, which the court held were testimonial. (*Cage, supra,* at pp. 980–981 [describing facts in *Davis*]; *People v. Barba* (2013) 215 Cal.App.4th 712, 721 [155 Cal.Rptr.3d 707] (*Barba*) [same].) Without providing an exhaustive list of testimonial statements, the court held: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* at p. 822; see *Michigan v. Bryant* (2011) 562 U.S. \_\_\_, \_\_\_ [179 L.E2d 93, 131 S.Ct. 1143, 1157] (*Bryant*).)

Following *Davis,* the court in *Cage* found a victim's statement made to an officer one hour after an assault was testimonial because the primary purpose was to investigate the crime, but the court found nontestimonial a statement to a doctor for immediate treatment of an injury. (*Cage, supra,* 40 Cal.4th at pp. 984–987.) The court derived "several basic principles" from *Davis*: "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency

situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage*, at p. 984, fns. omitted.)

In *Bryant*, the court clarified the meaning of *Davis*'s requirement that " 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency' " in the context of statements by a mortally wounded victim to officers arriving at the scene. (*Bryant, supra*, 562 U.S. at pp. ___, ___ [131 S.Ct. at pp. 1150, 1156].) Our high court in *People v. Blacksher* (2011) 52 Cal.4th 769 [130 Cal.Rptr.3d 191, 259 P.3d 370] (*Blacksher*) interpreted *Bryant* in a case involving an ongoing emergency and set out six factors to determine the "primary purpose" of police questioning. (*Id.* at pp. 811–816.) Although several of the factors related specifically to the circumstances of an emergency, which was not present here, two of the other factors guide our inquiry. Under *Bryant*, we "must objectively evaluate the circumstances of the encounter along with the statements and actions of the parties," and " 'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions' in the given situation." (*Id.* at p. 813.) The inquiry focuses on the *primary* purpose of the questioning, even though in emergency situations the parties may have mixed motives of both responding to an emergency and investigating a crime. (*Id.* at p. 814.) Moreover, "regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations." (*Id.* at p. 815.)

Most recently, several cases, including *Williams*, *Lopez*, and *Dungo*, addressed confrontation clause challenges to expert testimony based on forensic evidence. In *Williams*, one of the grounds on which the plurality found no confrontation clause violation was that the report on which the expert relied was prepared for the primary purpose of finding a dangerous rapist still at large, not to target an accused individual. (*Barba, supra*, 215 Cal.App.4th at p. 719, citing *Williams, supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) In his concurring opinion, Justice Thomas found no confrontation clause violation because the report "lack[ed] the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact." (*Williams, supra*, at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.); see *Barba, supra*, at p. 720.)

■ Interpreting *Williams* and two other recent cases,[15] our Supreme Court in *Dungo* and *Lopez* formulated a two-part test to determine whether an out-of-court statement is testimonial: "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*Dungo, supra,* 55 Cal.4th at p. 619; see *Lopez, supra,* 55 Cal.4th at pp. 581–582.) The court recognized the United States Supreme Court has not agreed on a precise definition for either requirement. (*Dungo, supra,* at p. 619; *Lopez, supra,* at p. 582.) In *Dungo,* the court held statements in an autopsy report the testifying expert used to reach independent conclusions (but which was not itself admitted into evidence) met neither requirement because the objective facts in the report were not sufficiently formal to be testimonial, and the primary purpose of the report was not to target an accused individual, but to provide an official explanation for an unusual death. (*Barba, supra,* 215 Cal.App.4th at p. 721 [explaining *Dungo*].)[16] In *Lopez,* the court held machine-generated results and chain-of-custody notations in a lab report admitted into evidence and used by an expert to render an opinion on the defendant's blood-alcohol level were not sufficiently formal to be testimonial because there was no attestation of validity and there was no way to cross-examine the machine that generated the results. (*Barba,* at p. 720 [explaining *Lopez*].)

Although the out-of-court statements on which Officer Krish relied as an expert witness do not fall neatly into either the *Davis* line of cases involving statements to officers during emergencies or the *Williams* line of cases involving expert testimony based on forensic evidence, we think under any definition of "testimonial" the general background information he obtained from gang members, other officers, and written materials on the history of the El Sereno and Lowell Street gangs plainly does not qualify. Officer Krish testified he simply talked to experienced officers, read materials, and discussed the gangs' history in casual, consensual encounters with gang members in order to learn more about the history of the gangs, which gang expert witnesses almost surely must do to become qualified as experts. There is no evidence to suggest any of this information bore any degree of solemnity or

---

[15] *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314, 129 S.Ct. 2527]; *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [180 L.Ed.2d 610, 131 S.Ct. 2705].

[16] In his concurring opinion in *Dungo* joined by three other justices, Justice Chin provided further guidance on how to interpret *Williams.* (*Dungo, supra,* 55 Cal.4th at pp. 627–628 (conc. opn. of Chin, J.).) Because neither the plurality opinion nor Justice Thomas's concurring opinion could be considered a logical subset of the other, even though they made up the holding of the court, "we must determine whether there was a confrontation clause violation under Justice Thomas's opinion *and* whether there was a confrontation clause violation under the plurality's opinion. If there was no violation under both opinions, then the result (finding no confrontation clause violation) would command the support of a majority from the high court's *Williams* case." (*Id.* at p. 629 (conc. opn. of Chin, J.); see *Barba, supra,* 215 Cal.App.4th at pp. 723–724 [following Justice Chin's concurrence].)

formality as required by Justice Thomas in *Williams* or by the court in *Dungo* and *Lopez*, or resembled in any way formal dialogue or interrogation as discussed in *Davis* and other cases.

Further, nothing in the circumstances of Officer's Krish's interactions with gang members and other officers objectively indicates the primary purpose of Officer Krish's questioning was to target appellants or any other individuals or crimes for investigation or to establish past facts for a later criminal prosecution. Officer Krish testified he never had any personal contact with appellants and never investigated any Lowell Street crimes. To the contrary, he merely educated himself about the history of gangs in an area in which he was assigned as a gang officer, which would help him better understand and perhaps more effectively investigate gang activity. Like the mixed motives of officers and witnesses during ongoing emergencies, that he used this general information to testify as a gang expert at trial does not mean his *primary purpose* in obtaining this information was to use it against appellants in a later criminal prosecution. Day in and day out such information would be useful to the police as part of their general community policing responsibilities quite separate from any use in some unspecified criminal prosecution. Further, nothing in the consensual encounters with gang members or officers suggests they might have reasonably understood Officer Krish's primary purpose was to use their statements in a later prosecution. This information is of a wholly different character than the information officers obtained from the witnesses in *Davis* and other cases, and it implicates the confrontation clause even less than the DNA report in *Williams*, which according to the plurality had a primary purpose of finding a rapist, or the autopsy report in *Dungo* with its primary purpose to provide an official explanation of an unusual death.[17]

▮ Here, appellants' confrontation clause challenge is limited to Officer Krish's reliance on general background information from written materials and casual, consensual conversations with gang members and other officers about the history of the Lowell Street and El Sereno gangs, none of which implicates the formality and primary purpose aspects of the confrontation clause. Because this information, which is the same type of information gathered and used by every gang expert in the field, cannot be considered testimonial, Officer Krish's testimony did not violate appellants' confrontation clause rights. (See *Hill, supra*, 191 Cal.App.4th at pp. 1135–1136.)

---

[17] Although there was no ongoing emergency in this case as discussed in *Davis* and *Cage*, "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." (*Bryant, supra*, 562 U.S. at p. ___ [131 S.Ct. at p. 1160].) Consistent with *Dungo* and *Lopez*, *Davis* and *Cage* still required a primary purpose "to establish or prove some past fact for possible use in a criminal trial," and that purpose is absent here. (*Cage, supra*, 40 Cal.4th at p. 984; see *Hill, supra*, 191 Cal.App.4th at p. 1136 [applying *Davis* and *Cage* to gang expert basis evidence].)

3.–8.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments are modified to award Uribe 1,112 days of presentence credit (742 actual days and 370 days of conduct credit) and Valadez 890 days of presentence credit (742 actual days and 148 days of conduct credit). In all other respects, the judgments are affirmed. The trial court is directed to amend the abstracts of judgment to reflect the modified presentence custody credits for Uribe and Valadez and forward copies to the Department of Corrections and Rehabilitation.

Bigelow, P. J., and Rubin, J., concurred.

Appellants' petitions for review by the Supreme Court were denied January 15, 2014, S214295.

---

*See footnote, *ante*, page 16.